# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Pennsylvania Department of Revenue, : 
                Petitioner : 
           : 
        v. :   No. 295 C.D. 2024
           :   Argued: December 9, 2024
Matthew Haverstick (Office of Open : 
Records), : 
            Respondent : 


BEFORE:   HONORABLE RENÉE COHN JUBELIRER, President Judge
              HONORABLE CHRISTINE FIZZANO CANNON, Judge (P.)
              HONORABLE MARY HANNAH LEAVITT, Senior Judge

OPINION BY
PRESIDENT JUDGE COHN JUBELIRER      FILED: January 9, 2025


The Pennsylvania Department of Revenue (Department) petitions for review of a Final Determination of the Office of Open Records (OOR), granting the administrative appeal of Matthew Haverstick (Requester) from Department's denial in part of a request made under the Right-to-Know Law (RTKL)[1] and ordering that Department produce a spreadsheet containing weekly lottery sales data by retailer (Weekly Lottery Data). Upon careful review, we agree with OOR that the Weekly Lottery Data is disclosable under the RTKL and, therefore, we affirm.

## I. BACKGROUND

### A. *The RTKL Request*

On October 9, 2023, Requester submitted a request under the RTKL (Request) to Department, which stated:

---

[1] Act of February 14, 2008, P.L. 6, 65 P.S. §§ 67.101-67.3104.

> In the Report titled "Pennsylvania 'Skill Machines' and Lottery Revenue Impact Analysis Methodology and Results 2023 Update," Sci[entific] Games[2] analyzed weekly lottery sales at the retailer level as a function of number of skill games (or presence of skill games). Therefore, a single file should already exist that has weekly lottery sales for each retailer and how many skill games are present at that location. Please provide that file.

(Reproduced Record (R.R.) at 7a.) Department determined that there was one record responsive to the RTKL Request, an excel spreadsheet (Spreadsheet), which included 17 separate columns of information, including one column listing the Weekly Lottery Data and one column indicating the number of skill games at the retailer's location.[3] (*Id.* at 142a-43a.)

By letter dated November 16, 2023, Department produced the Spreadsheet but redacted the information listed in the Weekly Lottery Data column. (*Id.* at 58a, 142a-43a.) Department explained release of the Weekly Lottery Data

> could result in a loss of state funds by the Lottery, and result in a substantial and demonstrable risk of physical harm to the personal security of individuals located at the lottery retailers' locations . . . [and r]eleasing the amount of money held by a retailer at a given time makes that retailer a potential target for crime and financial loss to both the retailer and the Commonwealth.

(*Id.* at 58a.)

On December 4, 2023, Requester filed an administrative appeal with OOR, seeking disclosure of the Weekly Lottery Data. (*Id.* at 1a-2a.)

---

[2] As discussed more fully below, Scientific Games is a contractor hired by Department.

[3] Specifically, the Spreadsheet contained the following columns: Area, District, Retailer Number, Location Name, Street Address, City, Zip, County, Games of Skill, Week, Facings, Instant Sales (i.e., the Weekly Lottery Sales), Total Games, Average Days in Market, Video Gaming Terminal (VGT) Count, Time, and Days between. (R.R. at 142a-43a.)

B.    *OOR's Final Determination*

In the administrative appeal, based on the submissions from the parties, OOR considered, in pertinent part, whether the Weekly Lottery Data was exempt from disclosure under Section 708(b)(1)(i) (State Funds exception), Section 708(b)(1)(ii) (Personal Security exception), Section 708(b)(6)(i)(A) (Personal Financial Information exception), or Section 708(b)(11) (Trade Secret and Confidential Proprietary Information exception) of the RTKL.[4]

---

[4] Section 708(b)(1), (6), and (11) provides, in relevant part:

(b) Exceptions.--Except as provided in subsections (c) and (d), the following are exempt from access by a requester under this act:

(1) A record, the disclosure of which:

(i) would result in the loss of Federal or State funds by an agency or the Commonwealth; or

(ii) would be reasonably likely to result in a substantial and demonstrable risk of physical harm to or the personal security of an individual.

. . . .

(6)(i) The following personal identification information:

(A) A record containing all or part of a person's Social Security number, driver's license number, personal financial information, home, cellular or personal telephone numbers, personal e-mail addresses, employee number or other confidential personal identification number.

. . . .

(11) A record that constitutes or reveals a trade secret or confidential proprietary information.

65 P.S. § 67.708(b)(1), (6), (11).

3

In support of its position, Department submitted a position statement, and five attestations from various Department and Lottery employees.[5] Specifically, in the position statement, Department argued that redaction of the Weekly Lottery Data was proper, reiterating that disclosure would result in loss of state funds, disclosure would reasonably likely result in substantial demonstrable risk of physical harm to lottery retailers, the Weekly Lottery Data contained personal financial information, and disclosure would reveal information protected by trade secret and confidential proprietary information. (R.R. at 31a-50a.)

Through a letter brief, Requester argued that Department did not meet its burden establishing any of the operative statutory exceptions under Section 708(b). (*Id.* at 126a-30a.) Requester further asserted that Department failed to justify its denial via an appropriate affidavit or exemption log, as required by OOR's Procedural Guidelines, and requested in camera review of the Weekly Lottery Data if Department satisfies this burden. (*Id.* at 130a-32a.)

On February 16, 2024, OOR issued its Final Determination, granting Requester's administrative appeal and ordering that Department produce the full, unredacted Spreadsheet. (Final Determination at 17.) Upon review of the materials submitted by the parties and through an extensive analysis of Section 708 of the RTKL, 65 P.S. § 67.708, OOR determined that the Weekly Lottery Data was not exempt from disclosure under any of the asserted statutory exceptions enumerated in Section 708(b). OOR analyzed each exception in turn.

---

[5] These items appear in the Reproduced Record at pages 21a through 123a. The attestations were from Anthony Lupino, Department's Deputy Agency Open Records Officer; Drew Svitko, Executive Director of the Pennsylvania State Lottery; Dan Coyne, Deputy Executive Director of Administration and Finance for the Pennsylvania State Lottery; Eric Grubbs, Deputy Executive Director for Sales for the Pennsylvania State Lottery; and Stephanie Weyant Fidler, Deputy Executive Director for Marketing and Product Development of the Pennsylvania State Lottery.

4

First, OOR determined that the Weekly Lottery Data was not exempt under the State Funds exception, 65 P.S. § 67.708(b)(1)(i). Relying on *Central Dauphin School District v. Hawkins*, 199 A.3d 1005 (Pa. Cmwlth. 2018) (*Hawkins I*), *vacated*, 662 Pa. 22 (2020), and *Pennsylvania Liquor Control Board v. Burns* (Pa. Cmwlth., No. 1159 C.D. 2019, filed June 16, 2020),[6] OOR reasoned that "[a]gencies must demonstrate that [] disclosure . . . will result in an **actual loss** of funding, rather than a potential loss," and speculative affidavits proffered by a party regarding possible future loss cannot satisfy an agency's burden under Section 708(b)(1)(i). (*Id*. at 4 (emphasis added).) OOR concluded that Department's "argument that disclosure of the [Weekly Lottery Data] would potentially undermine [] Department's position in a competitive market and result in the possible loss of future revenue is not sufficient to demonstrate that the disclosure of the [Weekly Lottery Data] would result in a loss of state funds." (*Id*. at 6 (emphasis removed).)

OOR then considered whether the Weekly Lottery Data was exempt from disclosure under the Personal Security exception, 65 P.S. § 67.708(b)(1)(ii), determining that the exception did not apply because the evidence submitted by Department

> does not support the conclusion that . . . the [Weekly Lottery Data] equates to the cash on hand of that particular retailer—especially . . . [given] a consumer's ability to complete cashless purchases . . . and [] that insights gained from the [Weekly Lottery Data] is likely to result in substantial and demonstrable risk to these retailers and their employees.

---

[6] Unreported opinions of this Court issued after January 15, 2008, may be cited for their persuasive value. *See* Pa.R.A.P. 126(b)(1)-(2); Section 414(a) of the Commonwealth Court's Internal Operating Procedures (IOP), 210 Pa. Code § 69.414(a).

(*Id*. at 9.) OOR noted that "an agency must show both: (1) a 'reasonable likelihood' of (2) 'substantial and demonstrable risk' to an individual's security if the information is not protected . . . [and] substantial and demonstrable [is defined] as actual or real and apparent." (*Id*. at 6 (citing *Governor's Off. of Admin. v. Purcell*, 35 A.3d 811, 820 (Pa. Cmwlth. 2011), and *Governor's Off. of Admin. v. Pennsylvanians for Union Reform, Inc.*, 105 A.3d 61, 66 (Pa. Cmwlth. 2014)).) OOR did not find the "anecdotal evidence" presented by Department persuasive, given it concerned non-Lottery skill machines and noting Department already released data as to the number of Lottery skill games at each retailer. (*Id*. at 7.)

To the extent Department argued release of Weekly Lottery Data would divulge how much cash a retailer had on hand, making them a target of robberies, OOR analogized this case to *Department of Revenue v. Flemming* (Pa. Cmwlth., No. 2318 C.D. 2014, filed August 21, 2015), where we rejected a similar argument as it related to disclosure of data for Lottery retail agents and all purchased and winning tickets by each game by day and retailer. (Final Determination at 8-9.) OOR concluded that while the evidence offered by Department here "shows that crimes of theft and even violent ones have been committed in convenience stores, gas stations, and other locations where games of skill are present," this is not sufficient to satisfy Department's burden because "the [] evidence does not provide detail as to how a retailer's [Weekly Lottery Data], either presently or historically is reasonably likely to result in a substantial and demonstrable risk to personal security," as we held in *Flemming*. (*Id*.)

Next, OOR determined that the Weekly Lottery Data was not exempt under the Personal Financial Information exception, 65 P.S. § 67.708(b)(6)(i)(A), because the data of a sole proprietor collected and maintained by Department based on

6

Department's administrative oversight of the lottery system is not personal financial information as defined under the RTKL. (*Id.* at 9-11.) OOR determined the Weekly Lottery Data did not fall within the enumerated items set forth in the definition of "personal financial information" and, therefore, examined whether it fell within the catch-all, "other information relating to an individual's personal finance." (*Id.* at 10 (citing Section 102 of the RTKL, 65 P.S. § 67.102).)

In rejecting the Personal Financial Information exception, OOR distinguished the instant case from *Department of Conservation and Natural Resources v. Office of Open Records*, 1 A.3d 929 (Pa. Cmwlth. 2010) (*DCNR*), which involved certified payroll records of third-party contractors, reasoning that "[u]nlike the [information] discussed in *DCNR*, the [Weekly Lottery Data] is information collected by [] Department as information of Lottery sales, the majority of which is not retained by the individual retailers, but is remitted back to [] Department to be used in furtherance of programs to benefit older Pennsylvanians." (*Id.* at 11.) OOR concluded that the Personal Financial Information exception was inapplicable to the Weekly Lottery Data because "the total amount of weekly sales taken in by an individual retailer selling the Lottery tickets for commission pursuant to the terms of the contract that retailer has with [] Department can hardly be categorized as 'personal financial information' of those individual retailers." (*Id.* at 11-12.)

Finally, OOR considered whether the Weekly Lottery Data fell under the RTKL's Trade Secret and Confidential Proprietary Information exception, 65 P.S. § 67.708(b)(11), determining that the information was neither a trade secret nor confidential proprietary information (which are not interchangeable terms under the

7

RTKL).[7] Instead, OOR found that the Weekly Lottery Data constituted "financial records" as defined under Section 708(c) of the RTKL, 65 P.S. § 67.708(c), which provides that "[t]he exceptions set forth in subsection (b) shall not apply to financial records, except that an agency may redact that portion of a financial record protected under subsection (b)(1), (2), (3), (4), (5), (6), (16) or (17)." (*Id*. at 12-17.)

In reaching this conclusion, OOR analyzed our Supreme Court's decisions in *Department of Public Welfare v. Eiseman*, 125 A.3d 19 (Pa. 2015), and *City of Harrisburg v. Prince*, 219 A.3d 602 (Pa. 2019), and concluded:

> Given the Pennsylvania Supreme Court's broad interpretation of an account, voucher or contract as a financial record under Section 102 and because this [Weekly Lottery Data] represents monies collected from Lottery sales to be remitted to [] Department after commissions and other incentives are taken out, [] OOR finds that this information is a financial record under the RTKL and the exemption for trade secret and confidential proprietary information does not shield its disclosure.

(Final Determination at 13-14 (citing *Hancock v. Magellan Behav. Health of Pa.*, 304 A.3d 53 (Pa. Cmwlth. 2023)).)

Alternatively, notwithstanding Section 708(c), OOR also analyzed whether the Weekly Lottery Data was exempt as either a trade secret or confidential proprietary information under Section 708(b)(11) of the RTKL. On the issue of trade secrets,[8]

---

[7] *See Off. of Governor v. Bari*, 20 A.3d 634, 647-48 (Pa. Cmwlth. 2011) ("Importantly, 'confidential proprietary information' and 'trade secret' are defined separately under Section 102 of the RTKL; therefore, the terms are not interchangeable.") (citation omitted).

[8] "Trade secret" is defined as:

Information, including a formula, drawing, pattern, compilation, including a customer list, program, device, method, technique or process that:

(1) derives independent economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use; and

8

OOR reasoned that "[w]ith respect to commercial enterprises undertaken by government agencies, the Pennsylvania Supreme Court has stated that such enterprises remain 'governmental functions' and that the government's entry into the 'private sector' does not suggest a 'diminished cause for openness.'" (*Id*. at 15 (quoting *SWB Yankees LLC v. Wintermantel*, 45 A.3d 1029, 1042 (Pa. 2012)).) OOR determined that "the information claimed to be protected by trade secret is the [Weekly Lottery Data] of individual lottery retailers . . . [which] represents the total sales of Lottery tickets on behalf of [] Department by individual retailers to the general public." (*Id*. at 15.) Based on Department's argument that "the Lottery was established in 1971 for the purpose of generating revenue for programs for older Pennsylvanians," OOR concluded that "the revenue generated from the Lottery is remitted back to [] Department for distribution to government programs and records which reflect the weekly sales, in essence, reflect [] Department's generation of revenue . . . [which] appear[s] to be a governmental function . . . subject to public scrutiny under the RTKL." (*Id*. at 16.)

OOR also determined, based on the statutory definition of confidential proprietary information under Section 102 of the RTKL, 65 P.S. § 67.102,[9] that the

> (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.
>
> The term includes data processing software obtained by an agency under a licensing agreement prohibiting disclosure.

Section 102 of the RTKL, 65 P.S. § 67.102.

[9] Section 102 of the RTKL provides, in relevant part, as follows:

> "Confidential proprietary information." Commercial or financial information received by an agency:
>
> > (1) which is privileged or confidential; and

Weekly Lottery Data did not qualify as confidential proprietary information for the purposes of Section 708(b)(11)'s exception. In making this finding, OOR relied on *Department of Corrections v. Maulsby*, 121 A.3d 585 (Pa. Cmwlth. 2015), where we held that in determining whether disclosure of information will cause substantial harm to the competitive position, "an entity needs to show: (1) actual competition in the relevant market; and[] (2) a likelihood of substantial injury if the information were released . . . [and this analysis] is limited to harm flowing from the affirmative use of proprietary information by competitors . . . ." *Id*. at 590 (citations omitted). OOR determined:

> [T]he [Weekly Lottery Data] is [] Department's own data that is collected and compiled through . . . Scientific Games . . . [and] [b]ecause . . . [it] is [] Department's own information that is being compiled and reported . . . there can be no "substantial harm to the competitive position of the person that submitted the information."

(Final Determination at 16-17 (citing 65 P.S. § 67.102).)

Considering this analysis, OOR concluded that the Weekly Lottery Data was not exempt from disclosure under the RTKL, in turn, granting Requester's administrative appeal and ordering that Department produce a full, unredacted version of the Spreadsheet. (*Id*. at 17.)

Department now petitions this Court for review, presenting the same substantive arguments asserted in the administrative appeal, namely, that the Weekly Lottery Data "is exempt from disclosure as it contains trade secrets and confidential proprietary information and contains personal financial information . . . [and]

---

(2) the disclosure of which would cause substantial harm to the competitive position of the person that submitted the information.

65 P.S. § 67.102.

10

releasing this information would create a substantial and demonstrable risk of physical harm to the personal security of individuals located at the lottery retailers' locations." (Department's Brief (Br.) at 9.)

## II.    DISCUSSION[10]

To begin, "we note that the objective of the RTKL is to empower citizens by affording them access to information concerning the activities of their government." *McGowan v. Dep't of Env't Prot.*, 103 A.3d 374, 380 (Pa. Cmwlth. 2014) (internal quotation marks omitted) (quoting *SWB Yankees LLC*, 45 A.3d at 1042). "[T]he [RTKL] is remedial legislation designed to promote access to official government information in order to prohibit secrets, scrutinize the actions of public officials, and make public officials accountable for their actions." *Bowling v. Off. of Open Recs.*, 990 A.2d 813, 824 (Pa. Cmwlth. 2010), *aff'd*, 75 A.3d 453 (Pa. 2013). With these statutory principles in mind, "[a] record in the possession of a Commonwealth agency or local agency shall be presumed to be a public record." Section 305(a) of the RTKL, 65 P.S. § 67.305(a).

"[H]owever, the presumption shall not apply if (1) the record is exempt under [S]ection 708 of the RTKL; (2) the record is protected by a privilege; or (3) the record is exempt from disclosure under any other Federal or State law or regulation or judicial order or decree." *Off. of the Dist. Att'y of Phila. v. Bagwell*, 155 A.3d 1119, 1129 (Pa. Cmwlth. 2017) (internal quotation marks and citation omitted). "In addition, '[c]onsistent with the RTKL's goal of promoting government transparency and its remedial nature, the exceptions to disclosure of public records must be

---

[10] "This Court's standard of review of a final determination of the OOR is *de novo* and our scope of review is plenary." *Maulsby*, 121 A.3d at 588 n.5 (citing *Bowling v. Off. of Open Recs.*, 75 A.3d 453, 467 (Pa. 2013)).

11

narrowly construed.'" *Easton Area Sch. Dist. v. Miller*, 232 A.3d 716, 724 (Pa. 2020) (quoting *Pa. State Police v. Grove*, 161 A.3d 877, 892 (Pa. 2017)).

"The burden of proving that a record of a Commonwealth agency . . . is exempt from public access shall be on the Commonwealth agency . . . receiving a request by a preponderance of the evidence." 65 P.S. § 67.708(a)(1). "A preponderance of the evidence standard, the lowest evidentiary standard, is tantamount to a more likely than not inquiry." *Borough of Pottstown v. Suber-Aponte*, 202 A.3d 173, 180 n.11 (Pa. Cmwlth. 2019) (quoting *Delaware County v. Schaefer*, 45 A.3d 1149, 1156 (Pa. Cmwlth. 2012)). We have noted that to satisfy this evidentiary burden, generally:

> [A]ffidavits are the means through which a governmental agency details the search it conducted for the documents requested and justifies nondisclosure of the requested documents under each exemption upon which it relied. **The affidavits must be detailed, nonconclusory, and submitted in good faith** . . . . Absent evidence of bad faith, the veracity of an agency's submissions explaining reasons for nondisclosure should not be questioned. . . . In other words, **a generic determination or conclusory statements are not sufficient to justify the exemption of public records**.

*Pa. Pub. Util. Comm'n v. Friedman*, 293 A.3d 803, 822 (Pa. Cmwlth. 2023) (emphasis removed and added) (quoting *Off. of the Governor v. Scolforo*, 65 A.3d 1095, 1103 (Pa. Cmwlth. 2013)).

### A. *Financial Records*

As a prefatory matter, we first consider whether the Weekly Lottery Data is considered a financial record as the term is defined under Sections 708(c) and 102 of the RTKL. Under Section 102, a "financial record" is defined, in relevant part, as "[a]ny account, voucher or contract dealing with . . . the receipt or disbursement of funds by an agency; or . . . an agency's acquisition, use or disposal of services,

supplies, materials, equipment or property." 65 P.S. § 67.102. In turn, Section 708(c) provides that "[t]he exceptions set forth in subsection (b) shall not apply to financial records, except that an agency may redact that portion of a financial record protected under subsection (b)(1), (2), (3), (4), (5), (6), (16) or (17)." 65 P.S. § 67.708(c).

Our Supreme Court has made clear "that [the] meaning [of financial record under the RTKL] is a broad one, encompassing not merely accounts, vouchers and contracts but also records bearing a sufficiently close connection to such 'fiscally related' categories, so long as they also 'deal with the receipt or disbursement of funds by an agency.'" *Prince*, 219 A.3d at 612 (citation omitted). Additionally, relevant here, our Supreme Court has previously examined the terms "account" and "contract" as they pertain to financial records under the RTKL and the disbursement of funds by an agency.

In *Prince*, the Supreme Court considered whether a spreadsheet created by the City of Harrisburg, listing funds received by donors for a legal defense fund, constituted a financial record under Section 102. *Id*. at 604-05. In examining a compilation of cases, the Supreme Court stated:

> [W]e will continue to construe the "account, voucher or contract" category broadly under the RTKL to effectuate expanded access to information about the activities of government . . . [and] we need not settle on a single definition of "account[;]" [r]ather, . . . the term has multiple acceptable definitions, including "a list or enumeration of financial transactions" and a "record of debit and credit entries, as well as monetary receipts and disbursements."

*Id*. at 615-16.

Under this broad interpretation, the Supreme Court rejected the argument that the donor spreadsheet was not a financial record, instead, categorizing the spreadsheet as an account because it comprised a list of funds received by the city,

13

reflected amounts deposited into the fund, and contained donation amounts and check numbers. *Id*. at 616-17. With this in mind, the Supreme Court then examined the interplay between Sections 102 and 708(c), reasoning that "[t]he fact that [the RTKL] simultaneously set forth a list of records, including certain donor records, that would be exempt from disclosure . . . does not require the conclusion . . . that the exemption necessarily applies . . . ." *Id*. at 617. Rather, the Supreme Court concluded that "subsection (c) makes plain that the General Assembly sought to ensure the disclosure of financial records . . . even if those records would be exempt from disclosure if they were not financial in nature." *Id*. at 617-18.

In *Eiseman*, our Supreme Court examined whether documents in the possession of the Department of Public Welfare (DPW), reflecting rates paid by managed care organizations (MCO) to dental subcontractors, pursuant to contracts between MCO and DPW, represented contracts dealing with the disbursement of funds by an agency. 125 A.3d at 29-30. The Supreme Court noted that "subcontracts containing MCO Rates plainly 'deal with' DPW's disbursement of billions of dollars of public monies to provide access to essential healthcare to vulnerable populations . . . ." *Id*. at 30. The Supreme Court held that it was "unable to conclude that records which must be submitted to a government agency for approval, and which embody a delegation (albeit a downstream delegation) of a governmental function of the agency, are not records 'dealing with' the agency's monetary disbursements and services acquisitions." *Id*. at 32.

Here, it is undisputed that the purpose of the state lottery system is to generate funding for government programs benefiting older Pennsylvanians. Section 301 of the State Lottery Law, 72 P.S. § 3761-301.[11] According to Department, "the State

---

[11] Act of August 26, 1971, P.L. 351, *as amended*, 72 P.S. § 3761-301.

14

Lottery Fund . . . is used to fund programs for older Pennsylvanians, the Lottery's operational expenses, and the Lottery's administrative expenses." (Department's Br. at 16 n.6.) Moreover, Department states that "[t]he Lottery operates as a distinct commercial enterprise driven by a clear profit motivation . . . , [a]s a competive [sic] endeavor operated for the benefit of older Pennsylvanian's [sic]. . . ." (*Id*. at 18.) To effectuate this purpose, Department admits that it uses the Weekly Lottery Data "to make business decisions to increase ticket sales responsibly for the purpose of generating funds for programs that benefit older Pennsylvanians." (*Id*. at 15.)

On appeal, although OOR determined the Weekly Lottery Data was a financial record, Department does not address Section 708(c) or the definition of financial records under Section 102. OOR reasoned, based on the Supreme Court's holdings in *Eiseman* and *Prince*, that under the "broad interpretation of an account, voucher or contract as a financial record under Section 102 . . . [the Weekly Lottery Data] represents monies collected from Lottery sales to be remitted to [] Department after commissions and other incentives are taken out . . . ." (Final Determination at 13-14.) OOR ultimately concluded that "the revenue generated from the Lottery is remitted back to [] Department for distribution to government programs and records which reflect the weekly sales, in essence, reflect [] Department's generation of revenue . . . [which] appear[s] to be a governmental function . . . subject to public scrutiny under the RTKL." (*Id*. at 16.)

We agree. Pursuant to Section 311(a) of the State Lottery Law, "[a]ll moneys received from the operation of the State lottery shall be deposited in a State Lottery Fund." 72 P.S. § 3761-311(a). Importantly, "[a]ll moneys remaining after payment of prizes and operating expenses shall remain in the State Lottery Fund and shall be allocated for the purpose of providing property tax relief for the elderly . . . and for

the purpose of providing free or reduced fare transit service for the elderly." *Id.* Additionally, pursuant to Section 303(a)(11)(iv)(C) of the State Lottery Law, Department is statutorily required to apportion the "total revenues accruing from the sale of lottery tickets or shares . . . for property tax relief and free or reduced fare transit service for the elderly . . . [and] no less than 20% of the total revenues accruing from the sale of lottery tickets or shares shall be dedicated." 72 P.S. § 3761-303(a)(11)(iv)(C). In other words, 20% of the revenue collected by the Lottery from retailers authorized to participate in the State Lottery system, by law, is remitted back to Department and then disbursed by Department to state programs benefiting Pennsylvania's elderly population.

This apportionment of Lottery revenue for elderly citizens is akin, in many ways, to the disbursement of healthcare funds for vulnerable populations in *Eiseman*. 125 A.3d at 30. It is undisputed that the Spreadsheet contains the weekly lottery sales data for each retailer. It follows that this information is necessary for Department to determine the Lottery revenue collected by each retailer, that is then required to be remitted back to Department and placed in the State Lottery Fund. *See* Section 315 of the State Lottery Law, 72 P.S. § 3761-315 ("Department . . . shall submit a report . . . [and t]he report shall set forth current lottery profits and the State Lottery's plan for increasing future profits. This report shall be posted on [] [D]epartment's publicly accessible Internet website."). Similar to *Prince*, the Weekly Lottery Data bears a "sufficiently close connection" to the "fiscally related" categories of the State Lottery Law and, in turn, Department's statutory responsibilities in administering the State Lottery system. 219 A.3d at 612. Thus, OOR correctly determined that the Weekly Lottery Data is classified as a financial record under Sections 102 and 708(c) of the

RTKL, and, therefore, we discern no error in this portion of OOR's Final Determination.

Accordingly, because we conclude that the Weekly Lottery Data is properly classified as a financial record under Section 102 of the RTKL, and, considering that Section 708(c)'s redaction limitation does not apply to the Trade Secret and Confidential Proprietary Information exception enumerated in Section 708(b)(11), we need not consider whether the Weekly Lottery Data is a trade secret or confidential proprietary information. *See Eiseman*, 125 A.3d at 32 ("With regard to such financial records, it is essentially undisputed that Section 708(c) renders the [RTKL's] own internal trade-secrets/confidential-proprietary-information exception inapplicable."); *see also Smart Commc'ns Holding, Inc. v. Wishnefsky*, 240 A.3d 1014, 1028 (Pa. Cmwlth. 2020) ("Having concluded that the [information] is a financial record under the RTKL, it is not necessary to consider [the] argument that the exception in Section 708(b)(11) related to confidential, proprietary information or trade secrets applies because that exception is not one of the enumerated exceptions that may be redacted from financial records."). However, there are other asserted exceptions that we must examine as, pursuant to Section 708(c), an agency may redact portions of a financial record that would otherwise fall within those enumerated exceptions.

### B. *Statutory Exceptions*

Turning next to the statutory exceptions under Section 708(b), we consider Department's arguments and examine whether the Weekly Lottery Data is non-disclosable under the State Funds, Personal Security, and Personal Financial Information exceptions of the RTKL.

### 1.    State Funds Exception (Section 708(b)(1)(i))

The State Funds exception "exempts from public access a record the disclosure of which 'would result in the loss of Federal or State funds by an agency or the Commonwealth.'" *Cent. Dauphin Sch. Dist. v. Hawkins*, 253 A.3d 820, 823 (Pa. Cmwlth. 2021) (*Hawkins II*), *aff'd*, 286 A.3d 726 (Pa. 2022) (quoting 65 P.S. § 67.708(b)(1)(i)). "[T]o establish that the requested [information] is excludable under the RTKL, the plain language of Subsection 708(b)(1)(i) require[s] the [agency] to prove, by a preponderance of the evidence, that disclosure of the [information] in fact 'would result in the loss of . . . funds by an agency or the Commonwealth.'" *Miller*, 232 A.3d at 726 (citation omitted). "This exemption requires more than the mere possibility of a loss of funds." *Burns*, slip op. at 31-32 (internal quotation marks, brackets, and citation omitted).

In its Final Determination, OOR considered the attestations submitted by Department, determining that none of the attestations provided any information beyond speculative conclusions, based in part on the information contained in the Scientific Games report, that the Lottery would lose state revenue if the Weekly Lottery Data was disclosed because, in essence, skill game owners could target Lottery retailers. (Final Determination at 4-6.)  Specifically, OOR considered the argument that Department "is a market participant in the gambling market, the Pennsylvania gambling market is competitive, and the Lottery vies for the expendable income of consumers against other types of gambling . . . , other forms of entertainment . . . , and the other types of packaged goods that are sold by the retailers . . . ." (*Id.* at 6.)  Relying upon *Hawkins I* and *Burns*, OOR concluded that "[t]he argument that disclosure of [the Weekly Lottery Data] would potentially undermine

18

[] Department's position in a competitive market and result in the possible loss of future revenue is not sufficient to demonstrate that the disclosure of the requested [Weekly Lottery Data] *would result* in a loss of state funds . . . ." (*Id*. (emphasis in original).)

On appeal, to the extent Department has adequately raised and developed this argument, we agree with OOR that the evidence proffered by Department is insufficient to exempt the Weekly Lottery Data from disclosure because Department speculates that the Lottery **may possibly** lose revenue, rather than showing that disclosure would **in fact** result in a loss of future revenue.[12] *Miller*, 232 A.3d at 726. Department does not provide any detailed argument on the State Funds exception in its briefing, beyond one footnote asserting that Department is entitled to the exception because, based on the report prepared by Scientific Games, the Lottery lost some $800 million between 2017 and 2023 because of "unregulated gaming, in the form of so-called games of skill." (Department's Br. at 16, 16 n.6.) On this point, Department simply concludes that "[t]he [Weekly Lottery Data] is not a public record under the RTKL, as it will lead to a loss of state funds." (*Id*. at 16 n.6.)

However, such conclusory and speculative assertions regarding possible loss of revenue are insufficient to bar disclosure under the State Funds exception, and, therefore, Department has not shown, by a preponderance of the evidence, that disclosure of the Weekly Lottery Data would in fact result in a loss of future funds to the Lottery. *See Burns*, slip op. at 31-32; *see also Miller*, 232 A.3d at 726.

---

[12] "The argument portion of a brief must be developed with pertinent discussion of the issues, including citations to relevant authority." *309 E. Hamilton St., LLC v. Allentown City Zoning Hearing Bd.* (Pa. Cmwlth., No. 1238 C.D. 2018, filed May 1, 2019), slip op. at 5 (citing Pennsylvania Rule of Appellate Procedure 2119(a), Pa.R.A.P. 2119(a)). "When parties fail to satisfy this requirement, the Court is 'neither obliged, nor even particularly equipped, to develop an argument for [them].'" *Id*. at 5-6 (quoting *Skytop Meadow Cmty. Ass'n, Inc. v. Paige*, 177 A.3d 377, 384 (Pa. Cmwlth. 2017)).

Accordingly, OOR properly determined that the Weekly Lottery Data was not exempt from disclosure under the State Funds exception and, thus, we discern no error.

### 2. Personal Security Exception (Section 708(b)(1)(ii))

"The Personal Security exception protects any record, the disclosure of which would be reasonably likely to result in substantial and demonstrable risk of physical harm to or the personal security of an individual." *Flemming*, slip op. at 6 (internal quotation marks and citation omitted). "To establish this exception, an agency must show: (1) a 'reasonable likelihood' of (2) 'substantial and demonstrable risk' to an individual's security if the information sought is not protected." *Carey v. Pa. Dep't of Corr.*, 61 A.3d 367, 373 (Pa. Cmwlth. 2013) (citation omitted). This Court has "defined substantial and demonstrable as actual or real and apparent . . . [and m]ore than mere conjecture is needed." *Id.* at 373-74 (internal quotation marks and citation omitted). Importantly, "[g]eneral, broad-sweeping conclusions will not be a substitute for actual evidence of the likelihood of a demonstrable risk to the individuals involved posed by a particular disclosure." *Pennsylvanians for Union Reform, Inc.*, 105 A.3d at 66 (citation omitted).

In *Flemming*, under a similar set of facts, we upheld an OOR determination finding that evidence submitted by Department was too speculative to warrant application of the Personal Security exception because the evidence did not show how releasing records of past Lottery ticket sales and winnings threatened the security of Lottery retailers in the present. Slip op. at 6-8. On appeal, the harm articulated by Department related to the potential for criminal activity at Lottery retailers because the lottery is a largely cash business, and "[t]he Department contend[ed] that divulging the number of winning tickets purchased at a specific retailer would divulge

20

the amount of cash on hand, which in turn, would encourage robberies of these retailers." *Id.* at 7.

However, in upholding OOR's determination, we reasoned that the affidavits proffered by Department "consist[ed] of speculation as to possible harms without containing any facts to indicate their likelihood[] [and,] [a]s such, the threat the Department describe[d] [was] pure conjecture." *Id.* (citing *State Emps.' Ret. Sys. v. Fultz*, 107 A.3d 860, 869 (Pa. Cmwlth. 2015)). We further reasoned that because "the [Lottery t]icket [i]nformation [] pertain[ed] to the history of winning tickets[,] [t]here [was] no evidence that such historical information correlate[d] to any present or future winnings[,] . . . [and] [n]either winners nor employees [were] identified in the [t]icket [i]nformation." *Id.* at 8. We, thus, rejected Department's arguments because the "evidence [did] not offer sufficient facts to support a 'reasonable likelihood' of harm to personal security" and concluded that OOR correctly declined to apply the Personal Security exception. *Id.*

On appeal, Department presents the same substantive arguments it did during the administrative appeal, claiming that it was error for OOR to decline to apply the Personal Security exception. Department contends that the Weekly Lottery Data is exempt from disclosure under the Personal Security exception because disclosure "for each individual Lottery retailer constitutes information that would be 'reasonably likely to result in substantial and demonstrable risk of physical harm to or the personal security of an individual.'" (Department's Br. at 22 (citing 65 P.S. § 67.708(b)(1)(ii)).) Specifically, Department asserts

> [g]aming machines, either Lottery, skill, or otherwise, found in gas stations and convenience stores . . . generally contain cash boxes . . . [and] [s]ome retail locations also sell Lottery products via a clerk with prizes . . . up to $2,500, if the retailer has cash on hand is willing to pay the prize claim.

21

(*Id*. at 23.)  Department further asserts

> [t]he vast majority of Lottery plays and game of skill plays are cash-based, as opposed to play purchased through credit or debit cards . . . [and] if most gaming plays are cash-based, it will be reflected in weekly sales totals for Lottery retailers, with higher weekly sales totals necessarily reflecting higher weekly cash sales.

(*Id*.)  Thus, according to Department, "[p]ublicizing the amount of cash a business has on hand by giving out the [W]eekly [L]ottery [] [D]ata makes it a target for crime, including the assault or murder of employees, the theft of cash or property and/or the destruction of property."[13]  (*Id*.)

In other words, disclosing the Weekly Lottery Data, in essence, would provide a roadmap to criminals to commit crimes against Lottery retailers.  (*Id*. at 23-25.)  Specifically, Department claims that releasing the Weekly Lottery Data makes retailers "an attractive target to unsavory elements and presents a risk of loss to the Commonwealth in the form of potential destruction of lottery equipment purchased and placed at retailers, all to access the cash the Lottery retailer is holding on behalf of the Lottery from the sale of its products."  (*Id*. at 25.)  Department concludes that disclosure of the Weekly Lottery Data "whether it be a convenience store, bar, or restaurant containing Lottery, skill, or other gaming machines creates a risk of physical harm to or the personal security of the individuals that work there, as they would be exposed to a risk of crime," therefore, supporting exempting the Weekly Lottery Data from disclosure under the Personal Security exception.  (*Id*. at 25-26.)

---

[13] Department points the Court's attention to the case of the Estate of Ashokkumar Patel, where, according to Department, the decedent was purportedly killed because "the suspect was known to have used and lost money at the games of skill in that store . . . [and] [t]he suspect entered the convenience store to steal money, knowing a large amount was on hand."  (Department's Br. at 22-23, 22 n.9.)  Department also cites numerous other news articles seemingly discussing crimes committed at Lottery retailers.  (*Id*. at 24 n.11.)

In *Flemming*, Department argued that disclosure of "the number of winning tickets purchased at a specific retailer would divulge the amount of cash on hand, which in turn, would encourage robberies of these retailers. . . . [and] target . . . Lottery winners." Slip op. at 6-8. These arguments were also supported by an affidavit. There was no evidence that correlated past winnings to future winnings. The Court determined Department's evidence did not have sufficient facts to meet the Personal Security exception.

Similarly, Department here has not met its burden of establishing that disclosure of the Weekly Lottery Data is reasonably likely to result in substantial and demonstrable harm to Lottery retailers because, beyond conclusory and speculative assertions, there is no evidence indicating that disclosure of the Weekly Lottery Data (which contains past sales information) correlates to future Lottery sales or sales related to games of skill.[14]

Specifically, Department analogizes Lottery sales to sales for private, non-Lottery skill games, essentially, concluding that because crimes of theft have occurred at businesses that operate such skill games, crimes will potentially occur at Lottery retailers if the Weekly Lottery Data is released. (*See* Department's Br. at 22-24.) However, as OOR recognized in its Final Determination, this argument is undermined by the fact that the Weekly Lottery Data does not contain any

---

[14] We have previously held in *Carey v. Pennsylvania Department of Corrections*, 61 A.3d 367 (Pa. Cmwlth. 2013), and *California Borough v. Rothey*, 185 A.3d 456 (Pa. Cmwlth. 2018), that conclusory and speculative statements cannot support the application of personal security related exceptions under the RTKL. In *Carey*, we examined the "Public Safety" exception under Section 708(b)(2) of the RTKL, 65 P.S. § 67.708(b)(2), which contained similar "reasonably likely" language, holding that "[i]n interpreting the 'reasonably likely' part of the test, as with all the security-related exceptions, we look to the likelihood that disclosure would cause the alleged harm, requiring more than speculation." 61 A.3d at 375 (citation omitted). In *Rothey*, we evaluated the security-related exception under Section 708(b)(3) of the RTKL, 65 P.S. § 67.708(b)(3), where we held "[a]n agency must offer more than speculation or conjecture to establish the security-related exceptions under the [RTKL]." 185 A.3d at 468 (citation omitted).

information on skill games and Department has already released data on the number of skill games located at each retail location. (Final Determination at 7.) Thus, Department's arguments are akin, in many ways, to *Flemming*, where we rejected a similar argument, offered through affidavits, as it related to disclosure of data for Lottery retail agents and all purchased and winning tickets by each game by day and retailer. Slip op. at 6-8. Considering our previous decision, we are not persuaded by Department's arguments here where the perceived threat of crimes of theft, based on data for skill games, is not a reasonably likely result of the disclosure of the Weekly Lottery Data. *See id.* at 7. Accordingly, OOR correctly determined that the evidence proffered by Department is insufficient to show a reasonable likelihood of harm to lottery retailers if the Weekly Lottery Data is disclosed, and, thus, the Personal Security exception cannot bar disclosure of the Weekly Lottery Data. Therefore, we discern no error.

### 3. Personal Financial Information Exception (Section 708(b)(6)(i)(A))

The RTKL exempts, in relevant part, "personal identification information . . . [including] [a] record containing all or part of a person's Social Security number, driver's license number, **personal financial information**, home, cellular or personal telephone numbers, personal e-mail addresses, employee number or other confidential personal identification number." 65 P.S. § 67.708(b)(6)(i)(A) (emphasis added).[15] Moreover, relevant here, "[t]he RTKL defines 'personal financial information' [as] [a]n individual's personal credit, charge or debit card information; bank account information; bank, credit or financial statements; account or PIN

---

[15] "As written by the General Assembly, the 'personal identification information' exemption is actually three separate exemptions . . . . [and] [t]he "[P]ersonal [F]inancial [I]nformation" exemption is found in clause (A) [of Section 708(b)(6)]." *DCNR*, 1 A.3d at 937.

24

numbers and other information relating to an individual's personal finances." *DCNR*, 1 A.3d at 937 (emphasis removed).

In the oft-cited case *DCNR*, we examined whether the disclosure of payroll records from third-party contractors, that had entered in contracts with the state for public works projects, were subject to the Personal Financial Information exception. 1 A.3d 929. The operative payroll records contained employees' names, social security numbers, home addresses, hourly rates of pay, gross amount of wages earned, number of hours worked, amount deducted from gross pay for taxes and/or benefits, and net pay. *Id*. at 931. We agreed with the agency's reasoning that "[w]hen coupled with the other information in the payroll records concerning [] wages and employment, the home addresses of employees constitute 'other information relating to an individual's personal finances' and should therefore be exempt from disclosure under [S]ection 708(b)(6)(i)(A)." *Id*. at 942 (emphasis removed). Thus, we adopted this reasoning, concluding that "[t]he financial information contained in the certified payroll records is only personal to the individual employees so long as the identity of the employees is attached to the information[] [and] [r]edaction of the names and/or addresses renders what was personal financial information, impersonal." *Id*.

In the Final Determination, OOR determined that the Weekly Lottery Data was not exempt under the Personal Financial Information exception, 65 P.S. § 67.708(b)(6)(i)(A), because the data of a sole proprietor collected and maintained by Department based on Department's administrative oversight of the Lottery system is not personal financial information as defined under the RTKL. (Final Determination at 9-12.) Specifically, OOR reasoned that the Weekly Lottery Data did not fall within the enumerated items set forth in the definition of "personal financial information." (*Id.* at 10.) In turn, OOR examined whether the Weekly

25

Lottery Data fell within the catch-all, "other information relating to an individual's personal finance." (*Id*. at 10 (citing Section 102 of the RTKL, 65 P.S. § 67.102).)

Distinguishing this case from *DCNR*, OOR found that "[u]nlike the [information] discussed in *DCNR*, the [Weekly Lottery Data] is information collected by [] Department as information of Lottery sales, the majority of which is not retained by the individual retailers, but is remitted back to [] Department to be used in furtherance of programs to benefit older Pennsylvanians." (*Id*. at 11.) OOR concluded that the Personal Financial Information exception was inapplicable to the Weekly Lottery Data because "the total amount of weekly sales taken in by an individual retailer selling the Lottery tickets for commission pursuant to the terms of the contract that retailer has with [] Department can hardly be categorized as 'personal financial information' of those individual retailers." (*Id*. at 11-12.)

On appeal, Department argues that the Weekly Lottery Data is subject to the Personal Financial Information exception under the RTKL. Department acknowledges that under the RTKL, personal financial information is defined as "[a]n individual's personal credit, charge or debit card information; bank account information; bank, credit or financial statements; account or PIN numbers and other information relating to an individual's personal finances." (Department's Br. at 26 (quoting 65 P.S. § 67.102).) Department asserts that "[m]any Lottery retailers operate as sole proprietors . . . [and] [t]hese retailers do not have a separate federal tax identification number; rather, they operate under their personal social security number." (*Id*.)

Department claims that "retailers are entitled to retain a portion of lottery sales in the form of commissions, bonuses or incentives . . . [and] [t]his amount is considered compensation." (*Id*. at 26-27 (citing Section 303 of the State Lottery Law,

26

72 P.S. § 3761-303).) According to Department, "[a]ny amounts that are retained by the retailer under these provisions is clearly considered taxable compensation under Pennsylvania law . . . [and d]isclosing these amounts would clearly disclose [the retailer's] personal income." (*Id*. at 27 (citing Section 303 of the Tax Reform Code of 1971, 72 P.S. § 7303(a)[16]).) Department concludes that "release of the [W]eekly [L]ottery [] [D]ata would be releasing 'personal financial information' of those Lottery retailers who operate as sole proprietors in that those receiving said information could reasonably determine the personal income." (*Id*.)

However, unlike *DCNR*, the Weekly Lottery Data is not "coupled with" other privileged personal financial information, nor is it clear how such disclosure would result in disclosure of personal income when the Weekly Lottery Data, in essence, shows the total weekly revenue for the state Lottery system (which is public information). *See* Section 315 of the State Lottery Law, 72 P.S. § 3761-315 (indicating that the Department must submit a report to the Governor and General Assembly "set[ting] forth current lottery profits . . . [and that] [t]his report shall be posted on [] [D]epartment's publicly accessible Internet website"). Importantly, except for the Weekly Lottery Data, no other column in the Spreadsheet was redacted or withheld by Department, and Department does not argue, pursuant to *DCNR* or otherwise, that the Weekly Lottery Data, when "coupled with" the other data in the Spreadsheet, would divulge the personal finances of an individual retailer. Rather, Department simply concludes that disclosing the Weekly Lottery Data would disclose personal income. (Department's Br. at 27.) Moreover, the Weekly Lottery Data is just that, data on the weekly Lottery sales at each individual retailer. It simply does not follow that disclosure of the Weekly Lottery Data would allow an individual

---

[16] Act of March 4, 1971, P.L. 6, *as amended*, added by the Act of August 3, 1971, P.L. 362, 72 P.S. § 7303.

27

to determine the total personal income of each retailer based on this information alone.

In sum, we agree with OOR that the Weekly Lottery Data is not subject to the Personal Financial Information exception of the RTKL, and, thus, this portion of the Final Determination was not in error.

## III. CONCLUSION

Based on the foregoing reasons, OOR correctly determined that the Weekly Lottery Data is properly classified as a financial record under the RTKL and that none of the statutory exceptions under Section 708(b) bar disclosure and/or permit redaction. Accordingly, we discern no error in OOR's Final Determination and, therefore, we affirm.

_____
**RENÉE COHN JUBELIRER,** President Judge

28

**IN THE COMMONWEALTH COURT OF PENNSYLVANIA**

Pennsylvania Department of Revenue, :
                       Petitioner :
                               :
          v.                 :   No. 295 C.D. 2024
                               :
Matthew Haverstick (Office of Open :
Records),                             :
                 Respondent    :

## **O R D E R**

**NOW**, January 9, 2025, the Final Determination of the Office of Open Records, entered in the above-captioned matter, is **AFFIRMED**.

 

                                            _____

                                            **RENÉE COHN JUBELIRER,** President Judge